Mr. Nolis, you're ready with your appeal? Your Honors, may it please the Court, good morning. My name is Billy Nolis, and along with David Wyckoff and Victor Abreu, we're appearing this morning on behalf of Mr. Thomas. I would ask that the Court allow me to reserve ten minutes for rebuttal. As your Honors know, there are appeals and cross-appeals in this case, and I'll just launch in and we'll see where we go. That's fine also. It may be helpful. We don't jump on the clock or fumble on the goal line in any event, but clearly, not only because this is a capital case, but because of the intricacies of the procedural issues, as long as there's productive dialogue from either you or Mr. Breed, with either you or Mr. Breed, I don't anticipate that a duck is going to come down and take your head off of anything. So don't feel constrained when the red light comes on. Yes, Your Honors. Also, don't feel as though that suggests that you have the rest of your natural lifetime to proceed with your argument. Thank you for the admonition, Your Honors. Okay. And one other thing is, because it is so procedurally intricate, to the extent that it's clear what happened in State Court when you're making the issues that you're presenting to us, that would be helpful. I know there's one problem here where the PCRA Court adjusted on the merits and the Supreme Court didn't, and that's a different kind of problem. But a clear edpa path to us getting our arms around it, that would be helpful to lay out for us. Yes, Your Honor. With that, let me begin by taking a few moments and talking about the beyond a reasonable doubt instruction claim in this case. And taking Judge McKee, your cue, let me begin with the procedural posture. The State Courts rule that this claim is procedurally barred, that it was waived. The State Courts waiver ruling, as Judge Pollack found below, is not based on an adequate State ground. The State, it's the classic Pennsylvania inadequate procedural default. Given the State Courts waiver ruling, review of the, of what we submit as an erroneous beyond a reasonable doubt instruction is de novo by this Court. The Commonwealth has devoted several pages of its brief arguing that Your Honors should rule that the State Court bar as to this claim is appropriate. I can talk about it if the Court would like, but I'll simply note for you that in Banks, Fahey, Germain, Carpenter... I interpreted their brief to basically be preserving the record. They understand that we're bound by a bar precedent. In 11 cases, this Court has rejected that specific argument. So the claim is before this Court on the merits. Federal review is de novo. As to the merits, the reasonable doubt instruction in this case informed the jury... You're talking merits as to Strickland or merits as to due process? Merits as to due process. Substantive merits, and that's the Court claim, because if the Court agrees with us on the merits of the due process claim, there's no reason to go to a Strickland ineffectiveness analysis. And as to the due process claim, the instruction itself told the jury that a reasonable doubt would cause a reasonable person to restrain, emphasize that word, restrain from acting in a manner of great importance in his or her own life. But it didn't say that alone. It didn't say that alone. And they're required to look at a charge in its entirety. Yes, Your Honor. So what else did the charge say with respect to reasonable doubt? Nothing else on reasonable doubt, as far as we could tell, corrected that restrain construction that was provided. Judge Pollack quotes the instruction in his opinion. The common law describes it in its brief. We've described it. This isn't a situation where there's a later instruction that says, by the way, that restrain language that I said, I misspoke. No, but it's not just restrain. Isn't there some reference to pausing, or am I thinking of some other reference here or some other case? It is only to restrain in this case? Only to restrain from it? I think Your Honor is probably thinking of West v. Vaughn, which is one of the primary cases that we cited in the brief. And West is significant both for Teague purposes and substantively. And I'll talk about Teague in a couple of minutes. But just to stay at the substantive level, what West involved was an instruction that told the jury that the jury had to have a substantial doubt. And as the Court is aware, that's error under Cage v. Louisiana. Later in the instruction, the Court gave a construction of substantial doubt, which was that the jury should hesitate from acting. And that the Court in West held pure because it gave context to what the word substantial meant. By substantial, I mean hesitate. And it fixed the bad language, so to speak. To hesitate to act really is classic language used in Pennsylvania reasonable doubt instruction. In virtually every case. And it's the language accepted by Victor as a good instruction constitutionally. The problem in this case is that the core instruction used the phrase restrain. And it used that phrase in a manner that nowhere is there a part of this instruction where the judge says, oh, by the way, when I said restrain, I misspoke. I meant hesitate. Or by the way, when I said restrain, read restrain to mean and then provide some language meaning hesitate, meaning pause, meaning something along those lines. So there's nothing that fixes for the jury the word restrain. It's worse, actually, than the Cage instruction, which talked about a substantial doubt, because restrain lowers the burden. If you look at jury instructions, you have the beyond a reasonable doubt standard is up here. You have the Cage standard. A substantial doubt would be an easier standard for the Commonwealth to meet. Beyond a reasonable doubt, hesitate up here. Substantial here. Restrain is about as bad as it can get. Restrain means, dictionary-wise, both in Black's Law Dictionary and any dictionary you pick up on a street corner, it means use of force, pressure, prevent the action. It means I can't act. It means under a... The Holland case. Is this really different than the Holland case? Yes. The Holland case, Your Honor, had a bad positive construction, whereas this one has a bad negative construction as to reasonable doubt. In other words, the Holland case, now the Holland case, by the way, is pre-Winship, so it's not a constitutional case. It's a federal jury instruction proceeding. But even there, what the judge did is the judge gave an instruction that tried to describe what a reasonable doubt is without qualifying it. And here the qualification is that it has to be something that stops the jury from acting. And you know this, one of the aspects of the proof of how bad this instruction is, is that the Commonwealth's ultimate argument is, you know what, it really doesn't matter because jurors would bring their common sense. And even though restraint may be bad, jurors would bring their common sense when they're listening to the words beyond a reasonable doubt, and common sense would tell a juror it's not restraint. And you know, I'm not sure I'm willing to concede the point, but just for the sake of argument, let's assume that that were the case. The juror's common sense can fix an instruction that puts such a low burden on the Commonwealth, that so drastically changes the reasonable doubt standard. What you have here from the judge himself is an instruction to the jury, however, that says directly, now, discard, please, any notions of what the reasonable doubt is that you may have formed from previous reading, or whatever, and confine yourself simply to the definition I am about to give you. So the judge tells the jury, don't bring your common sense to bear. The words that I give you are the words you should apply in your evaluation of this verdict. And so, it's bad. It's a plain constitutional error. It leaps out of this transcript. It's a bad reasonable doubt standard. And in the words of Justice Scalia in Sullivan v. Louisiana, what you have is a case where, when you look at harmless error analysis, and your honors I'm sure have noticed, we've made no harmless error argument in the brief. Because in the words of Justice Scalia, when you have a bad reasonable doubt standard, there is no object, no conviction, upon which a review in court can conduct harmless error analysis. Now, to that use of cage, and I understand there's an issue about what Teague means vis-a-vis cage, because I don't have a successive petition here, but take that aside. Would Teague preclude our looking at the reasonable doubt issue through that lens and basically applying Scalia's focus in saying there's nothing here to apply reasonable doubt to, therefore we can't do harmless error analysis? Does Teague apply to a harmless error review, I think, as a consequence? You're suggesting that, if you are right, I'm not conceding you are, but if you are right, and there's a problem with the language you're saying within using the analysis in cage, we can't do harmless error, because obviously the evidence here, as Judge Pollack said, is it's mountainous. There's no doubt here at all. Which would usually be enough on reasonable doubt standard for the day to prevail. You're arguing that we can't get to that point because of cage, and then I think Teague keeps in that door. Maybe it doesn't, because maybe cage cannot be applied to this case. Right. And let me go there in a moment. But just the premise under the constitutional mode of analysis, even before Sullivan, the premise is that the entire idea of what you apply it to. There's no conviction, so to speak. That's the constitutional underpinning. Going back to Coole versus United States in 1970. Going back to cases from the 70s and from the 60s. And there's plenty of them. There's Ulster County and Mulaney and Sandstrom, Winship, Connecticut versus Johnson, Francis, Patterson versus New York. All cases predating this trial that talk about the significance of the beyond a reasonable doubt standard. Now, those cases dealt with bad instructions on elements of an offense. Or burden shifting. But all of them, as their predicate, have the core constitutional value being the beyond a reasonable doubt standard. And when you take that core constitutional value away, Justice Scalia is totally correct. What is it that you apply harmless error standard to? Now, you could apply, as Judge Smith, as you suggested, there's a mode of harmless error analysis that looks to this kind of harmless error. You look to the instructions as a whole and you say, well, was this error fixed by something else in the instruction? And if we call that harmless error, it certainly is appropriate for this court to undertake that type of analysis. And our position is, when you parse the transcript carefully, there's nothing that fixes this bad instruction. And so that mode of harmless error analysis doesn't fix the problem here, unlike in the West case. Well, in the court, in the Victor case, didn't the Supreme Court say the issue in a situation like this is not whether it could have been misapplied, but rather whether there's a reasonable likelihood that it was misapplied? And in applying that test, you don't take into account all of the circumstances, including the evidence in the case? Well, if by likelihood the court meant you look at is there any way this defendant could have ever been acquitted, then you might as well not have the trial. Might as well not what? Might as well not have a trial. If harmless error analysis means this person would be convicted no matter what, under any circumstances, for purposes of the bad reasonable doubt instruction, then that would obviate the need for the trial itself. The core right that Mr. Thomas has, and other defendants, is the right to have a jury verdict beyond a reasonable doubt. And he was not provided with that. And a mode of harmless error analysis that goes beyond the four corners of the instruction does nothing to repair that underlying constitutional violation in this case. Now, turning back, Judge McKee, to your question as to the applicability of Teague and Cage, how they interplay with each other, this circuit helpfully has precedent on this point. And that precedent is the West v. Vaughn case that we've described in our briefs. It's a 2000 case from this court. West held four things. And let me go through each of the four. One of them has been overruled by the Supreme Court. Three of them remain the law of the circuit. All three of those are in Mr. Thomas' favor on this claim. Number one, West held that Cage was a new rule for purposes of constitutional retroactivity analysis. Now, if your honors would bear with me for a footnote for a moment, we've been talking about this for a couple of weeks now. We can't figure out how Cage is a new rule. I just rattled off a bunch of cases predating Cage that talked about the significance of the reasonable doubt standard. But I will tell you, that is the law of the circuit. Cage is a new rule. Therefore, as to that issue, West has already spoken. And as your honors know, we've discussed this in a footnote in a brief, but we haven't elaborated on it. Secondly, Cage held that for Teague purposes, the rule of Cage is, quote, essential to be retroactively applied. So for Teague purposes, Cage held, I'm sorry, for Teague purposes, West held that Cage is retroactive. And that's the law of the circuit. Third, West also held that Cage is retroactive for purposes of the federal successive petition filing, that you meet the higher, more stringent hurdle that a petitioner needs to meet to file a second federal habeas corpus 2254 petition. And West held that Cage is retroactive for those purposes as well. And finally, Cage held that a bad substantial doubt instruction is cured by a later instruction, as Judge Smith and I discussed, that uses the phrase, by substantial doubt, I meant hesitate before acting. You don't have that kind of cure in this case. In that aspect, the, quote, harmless error, for lack of a better phrase, type review of Cage isn't Mr. Thomas' favorite. In that, the retroactivity of Cage that this court acknowledged in West is consistent with the holding of the Tenth Circuit in Tillman, which we cited in the brief, the Second Circuit in Gaines, which we cited in the brief, and the Fourth Circuit in Adams versus Aiken, which is cited in West itself. So there's case law from other circuits saying Cage is retroactive for purposes of T. In Tyler versus Kane, the Supreme Court addressed the question, is Cage something that opens the door to a successive petition filing? I'm a petitioner, I filed, I litigated, I lost, I come back to federal court a second time after Cage and I ask for permission to file a successive petition. And the Supreme Court held that given the higher burden for successive petition filings, Cage does not open the door to a second petition. That's the holding of Tyler versus Kane. Tyler versus Kane did not overturn this court's substantive analysis in West. And Tyler versus Kane did not overturn the law of this circuit, the Second Circuit, the Fourth Circuit, and the Tenth Circuit, that holds that Cage is retroactive because it's bedrock for purposes of a Teague analysis. The law of this circuit is also, in Banks and in McLaughlin, which we cited in the brief, that when there's a precedent that's on point from this court, on points A and B, and the Supreme Court overturns point A of that precedent, point B is still the law of the circuit. The Supreme Court did not overturn the Teague aspect of West. And so the precedent of this circuit is that Cage applies to Mr. Thomas' case retroactively under Teague. It's a little convoluted, but when you look at West and you look at the three pages in our third step brief where we've actually laid out this history, it's very clear West determines the Teague issue and determines it in a way favorable to Mr. Thomas. And ultimately, you know, there's an aspect to the Commonwealth submission that tries to make light of this issue, as if we're just playing a word game here. But one of the core principles that we all learn in the first year of law school is jury instructions mean something. I mean, those of us who've tried cases, we know they mean something to juries. And when you give the jury a bad, beyond a reasonable doubt instruction, it is as bad an instructional error as you can get. This court has granted relief on other instructional errors in capital and non-capital habeas cases. When you have a bad, beyond a reasonable doubt instruction, you can't get worse than that when you have an instruction that flat out takes away from the Commonwealth the burden of proving guilt beyond a reasonable doubt, so that there's really no conviction there. Unless your honors have a question, that's my presentation as to the beyond a reasonable doubt instruction. The briefs have laid it out clearly, and our position is when you look at the actual applicable case law, this is a legitimate claim, and a legitimate claim upon which Mr. Thomas should be granted a new trial. With that, my next topic for discussion was going to be, depending on how your honors want to handle it, the issue of ineffective assistance of counsel at the penalty phase. Technically, we're the appellee on that issue, and I've spoken for a while on the first claim. Do your honors wish me to roll right into it, or should we just break up? What's your preference? It might be helpful to hear what Mr. Beeb has to say on that issue, and let you respond to that. I know I've read it more than once or twice, and I know my colleagues have, so we've been living with these briefs for the past several days, if not weeks. We know your argument on that, and it might be helpful to hear Mr. Beeb. I do have quite a bit to say, and I will sit down and listen to Mr. Gleave. That somewhat doesn't surprise me. I will sit down and listen to Mr. Gleave. I'll leave Mr. Gleave, however, with the thought that this really is a case of very bad lawyering. Thank you, your honors. Of course, he's going to say that's not the issue. Yes, sir. Good morning, Judge Beeb. Good morning, Judge Stapleton. Good morning, Judge Smith. May it please the court, my name is David Gleave from the Philadelphia District Attorney's Office, representing the Commonwealth in this cross-appeal. We are appealing Judge Pollack's grant of habeas relief based on the issue that Mr. Nollis was just about to address, but I'd be happy to address the jury instruction issue as the court would like. Just before I begin, I'd like to thank the court. It may not be clear from the briefs, but I actually came into this case at a fairly late date. There was a person at my office, Robert Fallon, who had handled the case both before Judge Pollack and at the initial stages in this court. He wrote the red brief. He left our office. I was right in the middle of doing a third petition last summer, and I appreciate the courts giving me enough time to finish that project and to move on to this one. So I'm the one who wrote the gray brief. I appreciate you referring to it by the color code. Is it after all step one, step two? Right, right. I know gray one is here. I think that makes it easier, especially this case where you have four. So I appreciate the court's consideration. On the instructional issue... That's not me. No, I don't know. I think Judge Smith, in his comment to Mr. Nolas, pointed out an important fact, which is that instructional claims should... Ignore it? Okay, sorry. I've never heard this before. No, we haven't. This is not a national security case. I hope not. Unless the building is going to be evacuated. If the building is evacuated, we would like to break if we could. I'm sorry to take that under advisement. I'd be happy to come back later. I don't know what, frankly, to make of Shiro versus Lanvigan. And when I first read your presentation of the holding in your brief, I said, that can't be right. And I went to Wesselheim and printed it out. It boggles my mind. And I know there's some issue about it doesn't appear to be a holding. But, boy, it's truly a strong suggestion that there is no right to a knowing and informed waiver of mitigation. I just cannot, somehow my mind can't grasp that concept. But that seems to be what the court is saying. Well, Your Honor, I'm a little bit confused now because I thought we were going to Okay. We'll show you my predisposition. Maybe something in that beat got lost. Right, right. Well, that's actually where I was going to start if I come up here. So I'm still confused. Why don't you go where you wanted to go and we can get to the issue. Let's finish. That's fine. Just keep on a continuum. I think I agree in a certain part with what Mr. Dulles is saying. And I agree with Judge Smith. I think the law is fairly clear that in cases where you are looking at jury instructions, the law is very clear that you have to look at the instructions as a whole. You're not supposed to parse them for fine meanings or do hair splitting. And especially you're not supposed to focus on one word. You're supposed to look at the entire, everything there. But do you agree that, at least semantically, the introduction of the word restraint and the notion of restraint somehow ratchets up what it is that a juror is going to do while listening and while deliberating from the notion of mere hesitation? Well, Your Honor, I think when you contrast the two, which is what happened in the Brown case, the Brown versus Foligno case, and I'm familiar with the court's footnote in that case, expressing some reservations on this very issue. That didn't happen here. When you say hesitate versus restrain, this is not mere hesitation. It is a restraint. I think in that case you do get something that approaches that intuition. You get something that's stronger. I have, speaking only for myself, I've engaged in no kind of semantic or etymological research into these two words, but it strikes me, and would strike me if I were a juror, that hesitate conveys more passivity than the notion of restraint. And if so, does that matter? I think that's right. But the question is not whether, the question is actually whether both terms can be said to convey to the jurors reasonable doubt. And we think that they both can. In fact, contrast the word restrain, which is used in this case, with the word refrain. Suppose the instructions had said reasonable doubt is the kind of doubt that would cause you to refrain from acting. But that could actually be synonymous with hesitation, couldn't it? Because it's a momentary refrain. It seems that refrain is more decision determinative, the way I look at it, than restrain. It's inaction. If you hesitate for a period of time, you've refrained from acting during the period in which you're hesitating. Well, Your Honor, just in the same way. And when you look at the word restrain, which was used here, there's a very ordinary sense of restrain where one acts with restraint. One acts in a restrained way. In fact, when prisoners are brought into the federal courts, they're in restraint. It doesn't mean they can't move. It doesn't mean they're absolute. They will restrain from acting. They're not brought into the court in a way that would restrain them from coming into the court, or else they wouldn't get there. But what I'm saying is there's a sense to restrain. If we're really going to parse these words in which restrain doesn't actually prevent action, restrain merely inhibits it or obstructs it in some way. But it isn't inhibiting it also more active than mere hesitation, than that momentary stopping or pause. I didn't ask Mr. Nolas this, and it seems to me if we get to the merits of this question from a due process perspective, I'm curious how one goes about crafting a constitutional rule as to just what measure or how many gradations of semantical restraint or activity is required to get to a point where due process is violated. But clearly, you have to admit that the two words are distinctively different in terms of what it compels a juror to do or not do. I think in the way the court has construed this, and I think that intuitively to me, restrain is somewhat more inhibiting than hesitate. I agree, but I don't think it was enough to say that the jury didn't know what a reasonable doubt was. What else in the jury would fix that? Taking your concession – and by the way, I must say that – I'm taking one from myself and probably going to get into this. But it's always a delight to have you argue because many times, especially in highly charged cases like this, both sides get so contentious and so litigious that common sense flies out the door. And you can't have a legal discussion because you're hung up with the emotions underlying who's going to win and who's going to lose. And both of you and Mr. Norris – at least I have never had that difficulty, so I'm really delighted that given the weight of this case and what's at issue here, that you are the two attorneys arguing it. I think it helps us. I appreciate that, Your Honor. But what fixes it here? What fixes the restraint? Well, Your Honor, we don't feel it. Your Honor is assuming it needs to be fixed. We don't think it needs to be fixed. But it is a heightened – taking what you just said, that it does suggest a heightened level of certainty. Slightly heightened. I mean, the Pennsylvania Supreme Court looked at this in December and looked at this exact question and said, yes, we see a slight difference, but it's de minimis. Really, the question is not whether restraint is slightly more restrictive than hesitate. That's not the issue. The issue is whether reasonable doubt – the jury used a wrong standard of reasonable doubt. What's the difference? And because the Supreme Court has said – What's the difference if the standard of reasonable doubt is a doubt that would cause one to restrain from acting as opposed to a doubt which would cause one to hesitate from acting? Or a doubt that would cause one to act, which is what the Supreme Court itself said. And when you look at that, that's the Holland case that Judge Stabelson mentioned. Look at that particular formulation. You can look at that in two ways. You can look at a person in a matter of something important who is already acting. The reasonable doubt is enough that he acts on it, which means pauses or hesitates. Or you can look at a person who hasn't moved at all in a matter of importance, and a reasonable doubt is enough to cause them to act. It conveys the same idea. What you're really suggesting is the entire criminal justice system is based upon semantical distinctions that qualitatively are not that different from deciding how many angels can dance on the head of a pin. You're saying that the differences are so minute and so subtle that it's really the same thing, yet the entire due process turns on that distinction, doesn't it? I don't think I would go that far, Your Honor. I mean, there is a difference in the way the words are used. And I think that the courts, because of these exact kinds of problems, a lot of courts have just simply tried not to define reasonable doubt at all. Just because when you define it, you use some other concept, and then that becomes confusing. And in this case, it seems like the courts have been trying to make something more clear, something that's intuitive. I think that's probably right. But if the definition that they give allows for, at least arguably, allows for a conviction on something which is less than what we would think of as the kind of doubt that would cause one to refrain from acting in a matter of the utmost importance to his or her own affairs, if it allows for that, then doesn't that subtle difference nevertheless have due process implications? Maybe it's a subtle difference, but there comes a point when no matter how slight the difference becomes, the difference between A and B may be a very slight, very subtle one, but there comes a point where that difference, no matter how small it may be, is still sufficiently great to give rise to due process. Well, that's what Cage and Sullivan say when you look at the Louisiana instructions. The Louisiana instructions talk about reasonable doubt as a grave and substantial doubt, and the Supreme Court was clear that that's too much. That sets the burden on the Commonwealth too low. But when you look at these instructions… But why is it that because of grave and substantial doubt would actually cause one to refrain from acting? It would probably cause one to do more. That's what I would say. More do how? Your Honor, I think really what we're arguing here is, again, going back to Judge Smith's comment, it's exactly what the Supreme Court says we can't do. Well, I understand. To parse these words so clearly. These words cannot be parsed so that they're exactly quantified. I think you're exactly right about that. That argument is usually made with this charge as a whole, as Mr. Norris says, in the overall flavor of the charge or there's something else in the charge that would suggest to the jury what their obligation is and what the burden of the proof is. And here, if you don't have anything else in the language except this one word sticking out, isn't it hard not to focus on that one word? Well, I mean, actually there is. I mean, the judge gave them that one sentence, which was actually taken from the Pennsylvania Supreme Court. I admit and I'll concede that the phrase itself is awkward, restrain from acting. And I think it's because when you look at the early formulations of this in the Pennsylvania cases, the phrase was actually it would restrain a reasonable person from acting. And somehow the phrase reasonable person got moved away and then you got restrain from acting going together. Restrain is something that really would apply not to acting but to the person itself. But you do have, I mean, the reasonable doubt instruction does go for several pages and the judge does contrast simply a possible doubt or speculative doubt. He doesn't say hesitate. He doesn't do the same thing as in Brown. But he doesn't merely simply – he doesn't simply say that. And as far as the judge saying put aside your common sense, that's correct. The judge said that. But at the same time, you have to understand what I'm going to tell you after this in terms of your common sense. Otherwise, you won't be able to understand it all or apply it. I'm not sure. Maybe it's just me and my little myopic mind. I don't know how common sense helps one to understand the technical term of beyond reasonable doubt. If you take each one of those words, they sure sound like they're pretty easy to understand. You put them together in the context of a due process claim. And I'm not certain that that is the kind of legal term that common sense really helps you with. There may be a better way to formulate it. I think Victor is the case where the court said there are a lot of different formulations. We're not going to require the courts to say it any. There basically are not any magic words. It sort of approved hesitate to act in a matter of great importance, although it said that that's not required either. I think our position is basically if the court does get to this issue, the difference in the two is so slight that it really made no difference as far as reasonable doubt was concerned. It's a quantitative difference, not a qualitative one. Yes, and that's what we're saying. It's a very tiny quantitative difference. When I came into the case, coming into it late, I did some research on my own and tried to find out what other courts have looked at this exact issue. In this district alone, I found district court judges or magistrate judges who have looked at either this exact language or what I think is a stronger phrase, which is refrain from acting, and Judge Coffman, Judge Kelly, Judge Yon, Judge Bechtel, Judge DuBois have all looked at that and said, well, yeah, there may be a slight difference between this and hesitate, but it's still within the limits of reasonable doubt. It's not enough, especially because, and I agree with Mr. Nollis, if there is an error here, it is structural error. But that doesn't mean that the error is easy to find because to get to the error, you have to apply Boyd. You have to say that it's reasonably likely that the jury didn't apply this, didn't apply reasonable doubt. Let's say the judge said something like reasonable doubt means more likely than not. That's clearly flat-out wrong. If the judge said that, we would be the first to come before the court and say, hey, this relief has to be granted. It doesn't matter what the evidence is. But it's nothing even close to that. That would be clearly wrong. This is a slight semantic difference and nothing really hinges on it. And many, many judges have looked at the exact same language or what I think is stronger language and said it's slightly different but it doesn't violate the concept of reasonable doubt. Let me make sure I understand you. You started out by saying, of course, that you've got to take an instruction as a whole and read the whole thing and see what it communicates to the jury. But since that time, you have not said anything that I have heard other than that the difference between restrain and refrain is de minimis or close to de minimis. You don't claim that there's anything else in the charge that corrected or ameliorated the reference that is causing the restrain from acting language. That's correct. There's nothing in this charge. The judge did contrast reasonable doubt as he defined it to use the word restrain. He contrasted that with speculative or possible doubt and said it's got to be an honest and genuine doubt, which we think is correct, and it's something that would cause a person to restrain from acting, which we think is correct, too. So there simply wasn't any need to correct it. It's not as if the judge did say reasonable doubt means more likely than not, or even reasonable doubt means clear and convincing. We would think that was wrong, too. But it's just simply the language itself, this word, focusing if we have to focus on this one word is, I admit, and I agree, I agree with the court's and Mr. Nolis' intuitions on that. It is slightly stronger than the word hesitate. It doesn't even come close to coming over the line as far as a reasonable doubt goes. Well, then the issue is where's the line? That's what I was talking about. Where is the line? The problem is you can't really define the line because there's no edict from on high dictating the definition. Well, except for I think that Holland case that actually Robert Fallon from my office that he cited gives the court some idea from the Supreme Court's perspective. It's something that would be sufficient to cause a reasonable person to act. That gives you an idea at least. It's not after you read that it's not as if you don't have any clue at all and you're just simply trying to figure out what the two words mean. I agree, it's difficult, and perhaps the court should come up with something. But, again, the problem is when they come up with an extensive or an example or an illustration, then we start picking that apart, too. Essentially, we don't think that the word itself survives the Boyd test. We don't think that that word, that you can look at these instructions and pick out that one word and say that because of that word, it's reasonably likely that this jury found Thomas guilty beyond or more than that. With less than a reasonable doubt. We just don't think it's even close. We agree that it's slightly stronger formulation than hesitate. But, again, it's different because the judge did not contrast it with hesitation. I think this goes to the footnote in Brown that Judge Smith wrote. When you look at the word restraint, it was contrasted in that case. The judge in that case said it's not mere hesitation or it's not hesitation. It's something stronger than that. That really didn't happen here. You had the contrast between restrained action and simply hypothetical speculative doubt, which everyone agrees is not going to be on the table. It's difficult because to the extent that Boyd is the test that has to be applied here, it almost invites a backdoor harmless error analysis. I'm sorry, the backdoor? It almost invites a backdoor harmless error analysis. Actually, I agree with that, Your Honor. That's where it comes in. And that's why the error, because it is structural error. And structural error is a major, it's going to vitiate the guilty sentence and require a new trial. I mean, if this language requires a new trial, we're going to have a lot of people getting new trials. Because this language or the language that talks about acting and being paused or being hesitated or being restrained or refraining from acting has been used time and time and time again. And it seems inconceivable to me that all of those courts and all of those juries were applying the wrong standards when they were applying that. Well, you may be absolutely right on the law, but if you're wrong, the fact that, who was it that said he complained about too much justice? I mean, if the result is a lot of people get new trials, then that's the result. I'm not suggesting. If it is, if it is. But that's why I'm saying if the language had said something like more likely than not, fine. That's a new trial. That's a slam dunk. It's just nowhere near that. Mm-hmm. Go ahead. I thought you were going to finish, and I was going to invite your argument on your appeal, but it sounded like as I began to do that, you wanted to say something else. No, I'd be happy to go wherever the court would like. If you don't want to address the ineffectiveness, go ahead. I'd be happy to address the ineffectiveness of the sentencing claim. This is a claim that was raised on direct appeal to the Pennsylvania Supreme Court. Well, what is it decided? Help me with this. It seems as though, from reading the Pennsylvania Supreme Court opinion, that what was decided was not the issue that he raised. He was arguing that there was not an informed, as I understand it, Mr. Mills will correct me if I'm wrong, that there was no investigation, number one. That's ineffective in and of itself. But to the extent that there may have been a waiver, the client was not in a position to waive because he never knew what mitigation meant. When you read the colloquy, what the state Supreme Court interpreted as being a waiver of mitigation, I'm not at all sure it's clear that Thomas knew what he was giving up. It seems to me the only thing that's clear on this record is he had exceptionally, not only bad, but pitiful lawyering. And so the normal kind of presumptions that you argue about in your brief or your colleague argues about in the brief, they almost fall by the wayside based upon the conduct of what happened after the jury came back to the guilty verdict and what the defense counsel did and didn't do. Well, Your Honor, I'm looking at the same record as the court is. I'm looking at it in terms of all of the information that my opponents have put forward. I mean, they haven't said that he was retarded. They haven't said that he had such below-average intelligence that he couldn't understand what was going on. It just seems very clear that he knew he had been found guilty. I think he understood what was going on, but it seems I'm not sure what there is to suggest that he understood Mitigation is a whole different kind of mark that even law students who haven't taken a course that touches on the subtleties of the death note, they don't know what was meant by mitigating and aggravating and all of that. And to the extent that the defendant was then in another part of the trial, he's asked about what he wants to do, and all those answers seem to harken back to the guilt phase. He doesn't want to say anything. He doesn't want to present any of his own testimony. But I'm not sure that that was intended to go to whether or not he wanted Mitigation, number one. And even if at the time he said he didn't want evidence of Mitigation, even if he said it, it seems to me that he has to be in a position to know what the heck Mitigation is. There's a whole separate argument about whether or not the evidence they say is Mitigation. I understand that, and we can address that. But it doesn't strike me as the situation that we have where somebody is, quote, a volunteer, close quote, because we have him languishing. But this guy just wanted, as he said, to bring it on. Well, Your Honor, if you look at what he said in his affidavit, that's exactly what he said. Brian Thomas said, I didn't understand what that Mitigation meant, something other than the circumstances of the actual crime. And the Pennsylvania Supreme Court looked at that and said, that simply doesn't square with the record. Let me stop you there, Mr. Gleeve. Would you concede that what the Pennsylvania Supreme Court said in the first instance on appeal from sentencing in the capital case is not what it said that it said later on in appeal from the PCRA? There's a difference. There's a significant difference in how the Supreme Court characterized what it did and what the Supreme Court said it did in the first instance. Right. Isn't there? I think there is a difference. Doesn't that make a significant difference for us here in terms of what we are reviewing for an effectiveness? Well, I think that's correct, and I think you'd have to look at the entire picture, though. You have to look at the fact that when you raise a claim of ineffectiveness for not presenting mitigating evidence at sentencing and being ineffective for that, can you continually, as things progress, as you get to the appeal stage and then you get to the PCRA stage and then you get to the PCRA appeal stage, can you continually change that claim, hoping that the court will eventually say, we already looked at this, and then when you get to the federal area. What the Supreme Court said on direct appeal from the conviction was that appellant complains that his trial counsel did not advise him that he could put on evidence of mitigating circumstances and that this omission was prejudicial in effectiveness. That's much more limited, is it not, than what the Supreme Court later on says in the year 2000 in footnote 3 of its opinion. On direct appeal, this court rejected appellant's claims, plural, that his trial counsel was ineffective for failing to present mitigation evidence in the penalty phase of his trial. Is that what the Supreme Court said in the first instance on direct appeal? Well, Judge Pollack looked at that exact question and said he thought there was a difference, too, but because it was the state court speaking about state law, he would take the Pennsylvania Supreme Court at its word. I mean, the Pennsylvania Supreme Court in doing that is trying to prevent, basically, being gamed, being gamed by someone who continually changes their claim and then eventually waits for the court to hold up its hands and say, look, we already decided that, and then basically comes back later in federal habeas and says, oh, well, the court didn't look at my claim, therefore I get the NOVA review, which is essentially what is going on here. I mean, there's nothing wrong with the state court doing that. The state court is looking at the basic claim that is being made. The fact that the claim keeps changing later on doesn't still mean that those claims weren't actually before the court in the first place. Did the claim change? I thought what changed was the court's view of what he was arguing, not what in fact he actually was arguing. Am I wrong about that? Your Honor, I think actually when you look at the progression, I mean, essentially he made the most general claim at the very beginning on direct appeal, and then made it more specific. I think on PCRA he made it more specific by giving affidavits from his mother and from his sisters, and then later on, on PCRA appeal, it was, well, look at all this psychological report that should have been put in. I mean, all of that was – Maybe putting more in the basket than the same basket, and what the Supreme Court seemed to be saying was, well, there was a different basket presented to us before. Well, I mean, that's why we agree with the way Judge Pollack handled that. He thought it was basically an expanding basket, but because the Pennsylvania Supreme Court said we did look at it, that's going to be the benchmark. I mean, it's difficult when a claim does keep changing, and you can see why the state courts would want to kind of clamp down on that and say, look, we're just not going to be the game this way. You have a claim, make your claim, and you can't just keep changing it after that, hoping that you're going to get more favorable treatment later. But we think in this case that the law is strong enough, especially Landrigan and Taylor, that when the court applies AEDPA to the claim, we don't see any reason why AEDPA review should not apply, that the claim is decided by those two cases. That gets me to where we started. You may be absolutely right that that's where the court was intending to go in Landrigan. It's suggested by our decision in Taylor, but boy, it seems to me if that's where the court wants to go with it, we've got to get a clearer signal than that, because that implicates not just the right to put on mitigation evidence, but you can make that same claim as to any other fundamental right that manifests itself through an evidentiary question. The right to present testimony on one's own behalf, and that's a due process principle, it manifests itself in the context of an evidentiary presentation. You could say the same thing about giving up the right to testify on one's behalf. It was never really held that you have to have a fundamental knowing and voluntary waiver, intelligent waiver, of an evidentiary principle. But don't we have to look at what that evidentiary principle is and what connects us to due process? Your Honor, there is, as I read my predecessor's red brief, he tried to make the point that this court owes some deference to the Pennsylvania Supreme Court's finding on the decision that Brian Thomas made. I would have argued that slightly differently, because under Pennsylvania law the Pennsylvania Supreme Court obviously looked at the fact that there was a colloquy and there was a waiver to present mitigating evidence. The Pennsylvania Supreme Court, as a matter of state law, could not have signed off on that waiver unless it was intelligent, knowing, and voluntary. And I'd be happy to give the court a case for that. So implicit in the Pennsylvania Court's basically signing off on the waiver, saying it was a valid waiver, it did make an implicit both a factual and a legal finding. The factual finding was made right there at the trial itself. I mean, that was the whole reason for a colloquy. It's not as if Brian Thomas simply stood up and said, well, I don't want to present any mitigating evidence, and then the court simply moved on. There was a lot of discussion at that point about, well, wait a minute, hold on. We want to make sure you understand what you're waiving here. And they asked him questions, several different questions. Roger King asked him questions directly. And getting back to whether he understood what was going on, it seemed fairly clear at that point that the prosecutor was talking about things that had nothing to do with the crime. The prosecutor was talking about his previous criminal conduct. The prosecutor was talking about, I guess, the attack on the child. That had nothing to do with the crime. Actually, the prosecutor, Mr. King, asked the lawyer for Mr. Thomas at one point, well, we'll stipulate to his age because age is a mitigating factor. I have no idea what was going on there. I just don't get it. But that shows that the idea that he didn't know that it only had to do with the crime itself can't be right. How does it show that? He didn't know what he was doing. How does it show that? Because he then didn't go ahead and put on any proof of those things, and you can argue that's suggesting the fact that he didn't want to put on any mitigation. And maybe it is, but I'm not sure that leaves out of it at all. I mean, the prosecutor says he will stipulate to age and education. There's a consultation between Mr. Watson and the defendant, and then Mr. Watson comes back and goes respectfully to the client to stipulate to something which is relatively innocuous. Well, it is. The age falls under one of the mitigating categories. I just think there's nothing to indicate he didn't know. I mean, maybe he didn't have a lawyer's understanding of mitigating evidence or how exactly all of that played, but he knew that the guilt phase was over. He knew this was to determine the penalty. He knew how serious it was. He knew this was life or death. And he still decided, I don't want to put anything in. Well, I'm just going to show in the colloquy that he has in any place else on the record, he has any concept of what is meant by mitigating and aggravating certain offenses. Whereas in one of the other cases, I think it's on the amulet, where the defendant actually is taught that there's an on-the-record discussion about aggravating factors and mitigating factors, and his clerk, this guy doesn't want to have any of them. In fact, every time the attorney tries to help him out by talking about, well, these prior acts of violence, he didn't understand those acts of self-defense. He understands, well, no, well, this guy's done it 14 times. I didn't suffer that. That's not this kind of case, is it? Your Honor, actually, when you look at the record or the law and these kinds of cases, these kinds of cases really aren't that uncommon. There are a lot of cases where exactly this happens, and I found the Lambert case, the Shelton case. I think we cited one or two other ones where they simply don't want to make that kind of presentation. They don't want to either, as a matter of strategy, which I think was Shelton, he thought it would have been not he wouldn't have been in the jury's graces if he basically begged for his life. There may have been something like that going on here. We don't know. There may have been. We don't know. That gets me, I guess, to Mr. Norris' alternative argument about an evidentiary hearing. It just seems to me that there's so much at stake here, and we're guessing, as you said, we really don't know, and there's no investigation of mitigation. Your Honor, we dispute that. You're right. Yes, you're right. Let me rephrase that. There's nothing on the record that suggests one way or the other, whether there was investigation of mitigation. In which case, the law fills in the gap is our position. The presumption. But, boy, when you look at that closing argument, that's what I said earlier, it's hard to presume that this attorney was acting in a professionally strickling manner, in a manner that was designed to be in the best interest of his client. It seems to me he didn't know what he was doing. Well, Your Honor, obviously the record speaks for itself. I expected the court to direct me to his closing argument. Yeah, what did you think of it? There's something we can call into it. It's two pages of a rambling. Speaking as a former Pennsylvania district attorney and Pennsylvania trial court judge who's heard his share in a prior life of incoherence, this ranks as one of the more memorable examples of that. There's not much to be said for this closing argument. Well, Your Honor, it says what it says. Can you imagine anything more insulting to a jury in the penalty phase than telling them essentially they were wrong? Actually, Your Honor, when you look at that, I don't think he was doing that. I think he was focusing on a question that the jury had. We have the wrong Mr. Thomas here. He didn't, Your Honor, the attorney had very little to go on. He had a heinous crime. That's exactly right. He had a jury who had an extremely disgusting heinous crime who had just found the man innocent. He had a client who was telling him, I don't want you begging for my life. I don't want you presenting anything. There's very little he could have said. You've very appropriately corrected me before when I overstated the record. You're really overstating it now. When you say that you had a client who told him he didn't want, he, the client, didn't want the attorney begging for his life, I don't want you presenting anything, that's not, you can argue that from the record, but that's not what the record says. Well, I agree. I'm inferring that from the record. I can see. When you look at, I think it may be unfair just to judge Mr. Watson, who I don't know, and I don't even know if he's still alive, to judge him just on the basis of that closing argument. Well, Mr. Green, this is not an atypical closing argument for Mr. Watson. It may be he maxed out on this argument in terms of being amongst his worst. Well, Your Honor, if the question is could it have been better, of course. It could have been better. The thing that complicates it here is you've got the three aggravators, which are just no doubt the aggravating factor there. You've got the prior heinous conduct by the guy, which you very appropriately argue in your brief, and your predecessor very appropriately argue in your brief. No defense attorney would want the jury to hear this stuff, because it really makes him out to be a psychopath, and a sexual predator in the very, very sickest and worst and most profound sense of that word. But the flip side of that is, and I don't know how it would play out in the minds of even one juror, that all other mitigation would suggest this history of depravity and sickness and wanton cruelty. I've seen a lot of stuff in my day, but this is right near the top of the kind of wanton cruelty that I've seen. I won't go too much further on the road. It's really off the charts. But the mitigating evidence, if it is mitigating evidence, in the hands of a skillful counsel, and that's how we have to look at it, could take all of that and argue to the jury that everything that he's done, including the crime that he was just convicted of, is totally explained by a diseased mental process, at least per the schedule to the trauma to the head that he suffered when he was 12 years old. So that the force of all that stuff, it seems to me, could be very seriously blunted by an attorney who knew what he was doing, who had done the investigation before trial, who knew that he had something to argue to explain this guy's conduct, not just in this case, but his conduct with the horse, the conduct with the three-year-old. I can't say it makes sense because it's too insane to make sense, but it all has context if the jury knows about the guy's brain injury and his mental problems. And yet none of that was brought out. Had the record shown that the defendant knew he could present all that stuff and decided, I don't want to do it, then it seems that we've clearly got Langland and Teller, and that's a slam dunk. And we wouldn't have had as much time into these arguments as we have if that was the case. But I'm not sure that is the case here. Well, Your Honor, I think that under Strickland we have to presume, first of all, if we can go back to that, to the investigation part. If the record is silent, basically we're not on an even playing field here. It's up to my opponents to come in and show, to proffer something from the attorney that said, no, I didn't do any investigation. Why? Where does that requirement come from? I mean, it's good if you have direct evidence, but the law has always, as far as I know, recognized circumstantial evidence as well. Right. And Judge Pollack said if he did investigate, we know that this was readily accessible to him and he would have gotten this, and if he was confident, he would have at least gotten some help for a mental examination of his client. Well, what I'm saying is the record itself is silent on that point. Isn't that a reasonable inference, however, as Judge Stapleton suggests? Of course, it's a reasonable inference to say that, but that's not the only reasonable inference. That comes back to this evidentiary hearing business. Did the Commonwealth ask the district court, and, of course, I know they asked that habeas relief be denied, but did the Commonwealth make the alternative argument that you at least got to give us a hearing where we can question Mr. Thomas about whether he really did think that mitigating evidence was limited to this and when we can hear and cross-examine all this mitigating evidence? Did you say anything like that? Our position, as I understand, my predecessor took the position before the district court that habeas relief could not be granted without an evidentiary hearing, and since the district court didn't grant one, that habeas relief couldn't be granted. We think that habeas relief could be denied, however, without an evidentiary hearing, and that's what we're arguing. So you get the same position you've taken before us, that is, you can't grant relief, you shouldn't grant relief without an evidentiary hearing, but you can deny relief without one. Well, we don't want to say that an evidentiary hearing is either required or necessary or even advisable in every case. In this case, it would be helpful, wouldn't it? And Thomas asked for an evidentiary hearing before the PCR-A court and was denied it, did he not? Yes. So he asked for an evidentiary hearing in the state system and was denied it. He did submit an affidavit in the state process, did he not? He submitted an affidavit from himself and from family members. As far as I know, though, there was nothing. Why is that not enough for the due diligence purposes of 2254E2? It can't be enough because it's too easy. There has to be some kind of proffer. For an evidentiary hearing, it can't simply be enough to say, well, I asked for an evidentiary hearing because everyone would and therefore everyone would have to be granted one. There has to be some proffer. It's an ineffectiveness claim. It's saying my counsel was ineffective because he didn't investigate, he didn't inform me of all of this and that. But there's no proffer on counsel's part. There has to be something on which the PCR-A court ---- A proffer as to what would be adduced at such an evidentiary hearing. By counsel, yes. Because until they come up with something from counsel, the strong presumption of counsel's effectiveness has to still be on the table. On this record, I just don't see a strong ---- It seems to me this presumption here is exactly the opposite. Reading what happened here, to then say that we have to abide by the historic presumption of competent counsel, really takes that presumption and turns it into a meaningless ritual. To defend every case no matter what the record is, no matter what the circumstances. By gosh, he had defense counsel. No matter how badly the defense counsel appears to have mismanaged the defense and blown it, we're going to defend, we're going to presume that counsel knew what he was doing every step of the way, even though what he did boggles the mind. Yes, and following that line, if we're talking about proffers that ought to be made, can you imagine any diligent defense counsel who sat by and watched his client supposedly waive an opportunity to adduce evidence of mitigating circumstances, not placing on the record in camera what he had, what he'd done, what he would have presented on his client's behalf to save his life, absent this supposed waiver from his client? And you have that in the case. The mind boggles that that wasn't done. That's correct. That was not done. I don't think that's required to have been done. I don't think Strickland requires that or any other case that I'm aware of. I mean, one of the things the court, I think, is discounting, and I think too much, is his ethical obligation to his own client. The lawyer under the rules of professional conduct. That's there on paper, but when you read his, and I will not call it an argument, when you read his final statement to the jury, that does seem to turn into a kind of an intellectual calisthenic to say that he was aware of that and that he discharged that faithful. I'm sorry. It's an intellectual calisthenic to say that this attorney discharged that obligation faithfully and dutifully. Well, Your Honor, I'm saying the obligation to abide by his client's wishes. His client made absolutely clear he did not want mitigating evidence presented. That's the point, I think, of the Landergan and the Taylor case. He did not want to say anything. He wouldn't stipulate. I don't get it, and I think that's probably his longest argument, that you could infer from Australia to stipulate to the age and education that he understood that that's mitigation. Because why else would you not stipulate that? And you may have something there. But on this record, to play that kind of a guessing game, it's troublesome when we could have a hearing and try to get this thing resolved. I'm not sure if Mr. Watson is alive or not. Maybe Mr. Northland. I actually started to Google him before I came in to see what I could find, but I didn't. I didn't have time to do that. Your Honor, one thing about the knowing issue, besides the fact that we're saying the Pennsylvania Supreme Court did look at that and could not have decided the way it did without finding it was knowing, I think the colloquy was extensive, and I think it's clear he did know what he was doing. The thing is, now what my opponents have been basically saying is, well, look at all this other evidence that could have been put in. Supposedly Thomas didn't know about all of that evidence. Consider that question. Exactly what didn't he know? Most of that evidence concerns him. He knew about his family. He knew about his own upbringing. He knew about the fact that he had been treated for psychological problems. He may not have seen the exact reports that the psychiatrists had made. He knew about his previous molestation of an infant girl. He knew about the incidents with the horses. He knew about all of this. I didn't know about any of this. He knew about all that, but what he may well not have known about was the underlying or may not be able to understand it was the underlying pathology that explained his disease incredibly. Your Honor, he may have looked at it just as an ordinary juror would have looked at it and said, this isn't mitigating. Well, he may be right. I think that if you were to boil down our position to a bottom line, I think that's fine with me if you want to boil it down to a bottom line. All of the things that they say should have been put in, if they had been put in, would not have convinced a single juror. Not that they weren't valid points, but that they outweighed the aggravators. That's the question. Maybe they would have found a mitigator or two. But they explain all that, so that's why this is a very different case. Your Honor, I think you'll agree in this, one of the cases you said in your brief, it's not just a question of two on one side of the scale and three on the other side of the scale. You could have one mitigating factor and eight aggravating factors, and the jury could still come back even unanimously, even though that's not required, and conclude that that one mitigating factor blows away the eight aggravating factors. And here, where you've got the one mitigating thing that you have is an explanation for all the aggravators. The jury may not accept it, and they may accept it and say, we don't care. This guy is just so bad, so dangerous that we want him out of here, and not in terms of a life sentence. We just want him. This is somebody who's clearly forfeited his life, and we're really sad about the circumstances that got him to this point, but nevertheless, he's forfeited his right to live amongst us, the way Mr. King argued in closing. But they may well have said, well, yeah, he is a sadistic beast. It's not totally his fault he's a sadistic beast. He had brain trauma when he was 12, and everything can kind of be, not even kind of, everything can be traced back to that. It's not clear to me that everything predates that brain trauma, but I think it does. One juror could easily look at that, it seems to me, and say this guy deserves to be locked up for the rest of his life, not necessarily executed. As far as that, if I could make a comment on that one juror idea, that's correct, because it only would take one juror to hold out. But it's not simply that he may have found one juror out of 1,000 or whatever who may have been a former social worker or a former defense counsel, and all of this would have made a lot of difference. Even former prosecutors sometimes have a little bit of sympathy in there. The standard is one reasonable juror, and that's what our position is, that given everything that they say should have been put in, given the weight of the aggravators, it would not have convinced one. It's not reasonably probable. If you take, as the law says we have to, avarice and anger and emotion out of it, which I don't think you can do, but assuming for a second that you can, just look at this as a matter of cold, hard reason. Why couldn't one person say in a very dispassionate way, this guy has a very sick mind, and I believe it's attributable to the brain trauma, or at least I'm not convinced that it's not a direct result of a brain trauma. I don't think that this person, given the mental pathology that he is suffering from, which is beyond his own culpability, I don't think that the state's ultimate penalty should be executed, no pun intended, on this guy. That's a very rational view to take. It seems to me the irrational view is to say, let's get him out of here. This is horrible what he did. We know what he did with these homicides. We know what he did with the three-year-old kid. This is about as bad and savage a human being as I've ever seen or ever dreamt of. He should be executed. That's the emotional part of it. And I don't know why it wasn't your end. Maybe we're going on a circle here.